[Cite as *Conley v. Faurecia Exhaust Sys., Inc.* , 2011-Ohio-4452.]

IN THE COURT OF APPEALS FOR MIAMI COUNTY, OHIO

WILLARD S. CONLEY, JR., et al.          :

     Plaintiffs-Appellants          :          C.A. CASE NO.     2009 CA 26

v.          :          T.C. NO.     06CV536

FAURECIA EXHAUST SYSTEMS, INC.          :          (Civil appeal from
et al.                              Common Pleas Court)

     Defendant-Appellee          :

                    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   2nd   day of    September   , 2011.

. . . . . . . . . .

MICHAEL S. MILLER, Atty. Reg. No. 0009398 and WARNER M. THOMAS, JR., Atty. Reg. No. 0009391, 140 East Town Street, Suite 1100, Columbus, Ohio 43215
     Attorneys for Plaintiffs-Appellants

GORDON D. ARNOLD, Atty. Reg. No. 0012195 and PATRICK J. JANIS, Atty. Reg. No. 0012194, One Dayton Centre, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
     Attorneys for Defendant-Appellee

. . . . . . . . . .

DONOVAN, J.

{¶ 1} Plaintiff-appellants Willard S. Conley, Jr., and his wife, Susan L. Conley, appeal from a decision of the Miami County Court of Common Pleas, General Division, sustaining defendant-appellee R & D Machine, Inc.'s motion to strike the affidavit of

Conley's expert, Ernest Chiodo, M.D., J.D. Additionally, Conley appeals the trial court's decision sustaining R & D's motion for summary judgment.

{¶ 2} The instant case is before us upon remand after the Ohio Supreme Court reversed our original judgment in *Conley v. Faurecia Exhaust Sys., Inc.*, Miami App. No. 2009 CA 26, 2010-Ohio-2394 (hereinafter "*Conley I*"). *Conley v. Faurecia Exhaust Sys., Inc.*, 127 Ohio St.3d 122, 2010-Ohio-5272. Our judgment in *Conley I* was reversed on the authority of the Ohio Supreme Court's earlier decision in *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237.

I

{¶ 3} We set forth the history of the case in *Conley I*, and repeat it herein in pertinent part:

{¶ 4} "In May of 2004, Faurecia Exhaust Systems, Inc. hired R & D in order to devise and implement a procedure to salvage defective catalytic converters. The catalytic converters consisted of an internal 'brick' covered with insulation called Unifrax which was glued to the brick. The insulated brick was housed in a metal casing. The bricks contained platinum, a precious metal. Accordingly, Faurecia wanted R & D to create a process to not only remove the bricks from the metal casing, but also remove the insulation coating the bricks, in order to salvage the platinum contained in the bricks.

{¶ 5} "Once the bricks were removed from the metal casing using a modified log splitter, R & D employees utilized two separate procedures to remove the insulation from the outside of the bricks. One process employed by R & D to remove the insulation involved the use of a nylon brush mounted on a buffer which was used to grind the insulation off of

the brick. The grinding process created a great deal of dust. Eventually, the grinding process was abandoned, and R & D instructed its workers to remove the insulation by scraping it off with a putty knife, which produced little or no dust.

{¶ 6} "Willard Conley, who had been hired by R & D in late June of 2004, was assigned to the task of removing the insulation from the bricks using the grinding method. Although the grinding was performed at a work station that was located outdoors, the operation still produced a great deal of dust. It is undisputed that Willard did not use any respiratory protection while grinding the insulation off of the bricks. Additionally, Willard claimed that he was told by Dan Daffner, owner of R & D, that officials at Faurecia stated that the insulation removal should be performed by employees wearing protective equipment in an enclosed environment with exhaust fans to remove the dust.

{¶ 7} "At some point, R & D employees became concerned that the dust created by the grinding process could be hazardous. In response, Daffner contacted Faurecia and asked for the material safety data sheet (MSDS) for the insulation material on the bricks. The MSDS for the insulation material, known an Unifrax, described the insulation as a 'refractory ceramic fiber product' which posed a possible cancer hazard if inhaled. The MSDS also stated that there was 'no increased incidence of respiratory disease in studies examining occupationally exposed workers.' Nevertheless, the MSDS advised an employer whose employees would be exposed to Unifrax to take specific precautions in order to insure employee safety. In particular, the MSDS advised employers to implement procedures designed to minimize airborne fiber emissions such as using 'local exhaust ventilation, point of generation dust collection, down draft work stations, [and] emission controlling tool

designs.'   The MSDS also recommended the use of a respirator or other respiratory protection to prevent inhalation of Unifrax, as well as wearing appropriate skin  and eye protection in order to minimize exposure to the ceramic fibers.

{¶ 8} "With the exception of performing the insulation grinding at an outdoor work station, Willard alleges that R & D failed to implement any of the safety procedures outlined in the MSDS even after Daffner was warned of the hazardous nature of the airborne ceramic fiber.   We note that Willard claims that he specifically asked Daffner for a respirator while he performed the grinding, but Daffner refused his request, stating that a respirator was too expensive.   Daffner, on the other hand, claims that R & D owned a respirator that was available at the time the grinding was performed.   After approximately two weeks of grinding the insulation from the bricks, R & D discontinued the process.   Thereafter, R & D instructed its employees to simply scrape the insulation from the bricks with putty knives.

{¶ 9} "Willard testified during his deposition that he worked on the insulation removal job for approximately four weeks, five days a week, and for ten hours a day.   On several occasions during the brick grinding process, Willard testified that he complained of feeling sick and had to be driven home.   Willard also informed Daffner that he had gone to the hospital to be treated.   Willard stated that when he showed hospital personnel the MSDS for the Unifrax, they told him he should be wearing safety equipment when he handled the insulation.

{¶ 10} "On August 17, 2006, the Conleys filed a complaint against R & D and Faurecia.[1]   In the complaint, Willard claimed that as result of the grinding process utilized

---

[1]Faurecia was dismissed with prejudice as a party to the litigation on June

by R & D, he was exposed to platinum dust and ceramic fiber dust which caused permanent injury to his lungs. In support of their claims, the Conleys presented the deposition testimony of Dr. Ernest Chiodo who opined as follows: 1) Willard was suffering from a lung disease and occupational asthma related to his exposure to chemicals released during the grinding process; 2) Willard has an increased risk of serious disease in the future; and 3) R & D exhibited a total disregard for Willard's safety and welfare by allowing him to be exposed to the chemicals released by the insulation grinding process. Dr. Chiodo also stated during his deposition that R & D acted recklessly by allowing Willard to grind the insulation off of the bricks without instituting the proper safety procedures; e.g. providing respirators and adequate ventilation as recommended by the MSDS for Unifrax.

{¶ 11} "On March 11, 2009, R & D filed its motion for summary judgment. The Conleys filed their memorandum contra on March 25, 2009. On April 3, 2009, the Conleys filed the affidavit of Dr. Chiodo in which they sought to supplement his deposition testimony. R & D filed a motion to strike Dr. Chiodo's affidavit on April 9, 2009. On May 13, 2009, the trial court filed two separate entries in which it granted R & D's motion to strike Dr. Chiodo's affidavit, as well as R & D's motion for summary judgment."

{¶ 12} In *Conley I*, we reversed the trial court's decisions granting R & D's motion to strike and its motion for summary judgment. Specifically, we relied on our prior decision in *Pettiford v. Aggarwal*, 186 Ohio App.3d 705, 2009-Ohio-3642, wherein we held that when considering whether a genuine issue existed in medical malpractice case, the trial court could consider the summary judgment affidavit of a non-party expert witness, even though

12, 2009 and is not involved in the instant appeal.

the affidavit contradicted the expert witness' prior deposition testimony. Based on our decision in *Pettiford*, we held the trial court should have considered Chiodo's affidavit when determining whether summary judgment was appropriate, even though the affidavit purportedly contradicted Chiodo's prior deposition testimony. *Conley*, 2010-Ohio-2394.

{¶ 13} After *Conley I* was decided on May 28, 2010, the Ohio Supreme Court reversed our decision in *Pettiford*, holding that the affidavit of a retained, non-party expert contradicting his or her former deposition testimony and submitted in opposition to a pending motion for summary judgment does not create a genuine issue of fact to prevent summary judgment. *Pettiford*, 126 Ohio St.3d 413, 2010-Ohio-3237, syllabus. Unless it was determined that the expert sufficiently explained the contradiction, the affidavit would have to be stricken. Id. In light of its decision in *Pettiford*, the Ohio Supreme Court reversed our decision in *Conley I* and remanded the case back to our Court for disposition. *Conley v. Faurecia Exhaust Sys., Inc.*, 127 Ohio St.3d 122, 2010-Ohio-5272.

{¶ 14} The Conleys' appeal is now properly before us.

II

{¶ 15} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 12.

{¶ 16} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶ 17} "(1) No genuine issue as to any material fact remains to be litigated; (2) the

moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. *Id*.

III

{¶ 18} Because they are interrelated, the Conleys' first and second assignments of error will be discussed together as follows:

{¶ 19} "THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFFS-APPELLANTS IN GRANTING DEFENDANT-APPELLEE R & D MACHINE, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE GROUND THAT THERE WAS NO GENUINE ISSUE OF FACT WHETHER THE DEFENDANT-APPELLEE COMMITTED AN EMPLOYER INTENTIONAL TORT."

{¶ 20} ""THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF PLAINTIFFS-APPELLANTS IN GRANTING DEFENDANT-APPELLEE R & D MACHINE, INC.'S MOTION TO STRIKE THE AFFIDAVIT OF THE PLAINTIFFS-APPELLANTS' EXPERT, ERNEST CHIODO, M.D."

{¶ 21} In *Conley I*, we addressed the standard for an employer intentional tort and

applied our analysis to the facts in the instant case, wherein we stated the following:

{¶ 22} "[T]he Conleys argue that the trial court erred when it sustained R & D's motion for summary judgment because the record demonstrates a genuine issue of material fact in regards to the establishment of an employer intentional tort.

{¶ 23} "In order to prove an employer intentional tort, an employee must meet the three-part test set forth by the Ohio Supreme Court in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115. The *Fyffe* test requires a person alleging an employer intentional tort to demonstrate the following: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform. *Id*.

{¶ 24} "With respect to the first prong of the *Fyffe* test, i.e., whether R & D had been aware of a dangerous condition within its operation, we conclude that the Conleys presented sufficient evidence to survive summary judgment. In his deposition testimony, Willard claims that he was ordered to grind the insulation off of the bricks with a nylon brush attached to a buffer. Willard testified that this process created a great deal of dust which essentially covered his clothes, hair, and exposed skin. Willard further testified that he was required to grind the insulation from the bricks in this manner for approximately two weeks before Dan Daffner abandoned the grinding in favor of scraping the insulation off of the bricks with putty knives.

**{¶ 25}** "Before the grinding process was abandoned, however, Daffner became aware that some of his employees were concerned that the dust being produced was harmful. In response to their concerns, Daffner requested the MSDS for the Unifrax insulation from Faurecia. The MSDS outlined the properties of Unifrax and described the relevant government regulations and safety precautions to be followed when handling the substance. The MSDS specifically noted that Unifrax was known to cause cancer if inhaled. While the MSDS stated that there was 'no increased incidence of respiratory disease in studies examining occupationally exposed workers,' the MSDS advised those handling Unifrax to take special precautions in order to insure their safety. The MSDS advised employers to implement procedures designed to minimize airborne fiber emissions such as using 'local exhaust ventilation, point of generation dust collection, down draft work stations, [and] emission controlling tool designs.'

**{¶ 26}** "The MSDS also recommended the use of a respirator or other respiratory protection to prevent inhalation of Unifrax, as well as wearing appropriate skin and eye protection in order to minimize exposure to the ceramic fibers. With the exception of placing the work station outside, it is undisputed that R & D failed to implement any of the safety precautions recommended in the MSDS while Willard was required to grind the insulation off of the bricks. In light of the information contained in the MSDS regarding the hazardous nature of Unifrax, as well as the recommended safety precautions when handling the substance, we find that a genuine issue of material fact exists in regards to whether R & D had knowledge of a dangerous condition.

**{¶ 27}** "The second prong of the *Fyffe* test involves the question of whether R & D

had knowledge that this dangerous condition – the hazardous nature of the Unifrax dust if inhaled – was substantially certain to cause harm to Willard. Substantial certainty of harm requires much greater proof than negligence or recklessness. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100. The Supreme Court of Ohio has stated:

**{¶ 28}** "'Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk – something short of substantial certainty – is not intent.' *Fyffe,* 59 Ohio St.3d at paragraph two of the syllabus, citing *Van Fossen,* 36 Ohio St.3d at paragraph six of the syllabus. This court has stated that simply knowing that an employee is at risk is insufficient; the employer must be virtually certain that an employee will be injured. *Spates v. Richard E. Jones & Assoc.*, Montgomery App. No. 15057, citing *Van Fossen,* 36 Ohio St.3d at 116."

**{¶ 29}** The Conleys retained the services of Dr. Chiodo, a doctor, a lawyer, a certified industrial hygienist, and a biomedical engineer, in order to provide expert testimony regarding the nature and cause of Willard's injuries. In his deposition, Chiodo provided the following testimony:

**{¶ 30}** "Q: Okay. Do you have any knowledge from any source that anyone at R & D intended to harm Mr. Conley?

{¶ 31} "A: I think maybe the best way to put it is they acted – acted in a manner that was reckless.  If you're going out there and shooting a gun off in a crowded area, you know, and you, just like in the wild west show, you're shooting off that gun in saloon, you may not specifically intend to have one particular person hit by that bullet, but you don't really care where the hell those bullets are going.  You're shooting them off in a reckless manner.  That's the best way to put it.

{¶ 32} "In this context, they really didn't care what happened.  They're grinding out the work[,] and they're not making sure that people aren't getting hit by the bullets.

{¶ 33} "Q: Did –

{¶ 34} "A: You can shoot off a gun, if you're going to go to a target range and shoot off a gun in a safe manner, but they're just shooting off that gun and they don't care who gets hit by the bullet."

{¶ 35} In his affidavit filed on April 3, 2009, Dr Chiodo opined as follows:

{¶ 36} "20. It is further my opinion that the MSD sheet required that the employer, R & D Machine, comply with the hazard safety requirements of the MSD sheet, and the handling requirements designated in the MSD sheet, including the use of gloves, eye protection, and respiratory protection.

{¶ 37} "21. It is further my opinion, based upon a reasonable and scientific certainty, *that once Dan Daffner received the MSD sheet from Faurecia, he would have been aware that injury and exposure were substantially certain to occur in workers exposed under the circumstances that existed at R & D Machine in the handling of this material, including Willard Conley.*

{¶ 38} "23. Further, it is my medical opinion and professional opinion, based upon a reasonable medical certainty and scientific certainty, that as a result of the failure to adhere to the clearly stated requirements of the Material Safety Data Sheet for refractory ceramic fiber, Mr. Conley has been exposed to vitreous aluminosilicate fiber, and that this fiber contains vermiculite and asbestiform, and further, that the medical testimony in this case indicates that Mr. Conley has developed interstitial changes in his lungs consistent with this exposure, and further that he has obstructive airway disease consistent with this exposure, and as a result, he will require medical monitoring by a qualified specialist for the rest of his life for ongoing evaluation of his lung function and potential for development of other debilitating diseases.

{¶ 39} "25. It is my further opinion, as I have expressed in a previously written report and in my deposition testimony, *the actions of R & D Machine, Inc., through Mr. Daffner, were so inconsistent with the duties and obligations upon an employer under OSHA that they rose to the level of an intentional act and subjected his employee to conditions under which there was a substantial certainty of harm,* which has since come to fruition for Mr. Conley."

{¶ 40} R & D argues that Chiodo's deposition testimony establishes that its behavior was merely reckless, as opposed to intentional, and therefore insufficient to rise to the level of an employer intentional tort. More importantly, R & D contends that Chiodo's deposition testimony directly contradicts his affidavit, in which he affirmatively states that R & D's actions regarding Willard rose to the level to the level of an intentional act. Accordingly, R & D asserts that the trial court did not err when it struck Chiodo's affidavit.

{¶ 41} Upon review, we conclude that the trial court erred by striking Chiodo's affidavit as   it did not contradict his deposition testimony on the second prong of the *Fyffe* test.   That is, whether R & D had knowledge that the dangerous condition – the hazardous nature of the Unifrax dust if inhaled – was substantially certain to cause harm to Willard.   In addition to the portion of testimony already noted, Chiodo also provided the following testimony:

{¶ 42} "Q: You [Chiodo] indicated that one of your opinions was that R & D's conduct reached the level of potential exposure and infliction of harm to Mr. Conley; is that correct?

{¶ 43} "A: I believe so, as far as R & D.

{¶ 44} "Q: What is the basis for that?

{¶ 45} "A: The fact that – based upon the history provided to of the exposure in a – in a manner that occurred with essentially no concern about his health and safety, no proper industrial hygiene or occupational health and safety practices were implemented.

{¶ 46} "Q: *And are you indicating that the – his employer at R & D had an intent to harm him?*

{¶ 47} "A: I think that based upon the circumstances, his employer took no action to protect him.   I think maybe the better way to put it is there was no effort to protect Mr. Conley and the – he could have been protected.   This could have been done in a safe and proper fashion, *but the employer for whatever reason chose not to do so, and that is an intentional decision to go forward in a manner that is not – that is not safe and proper.*   If you're going to go forward with the process, you're supposed to know how to do it safely.

*If you don't go ahead and inquire and make sure it's done safely, that is – that's an intentional decision to do so*."

{¶ 48} Accordingly, we conclude that Chiodo's deposition testimony does not contradict his affidavit testimony regarding the issue of whether R & D's conduct rose to the level of an intentional act. While we cannot ignore his use of the word "reckless ," Chiodo essentially testified in his deposition that R & D's failure to implement the proper industrial safety practices resulted in a substantial certainty that Willard would be harmed and suffer injury. We have held that a genuine issue exists for the purposes of summary judgment when the evidence included in an expert's affidavit states that the employer should have known that an injury was substantially certain to occur when the safety measures recommended by the MSDS were not followed. *Linebaugh v. Electrical Control Systems, Inc., et al.* (Sept. 23, 1994), Montgomery App. No. 14412. Viewed in a light most favorable to the Conleys, we find that there is evidence in this record from which a reasonable person could conclude that R & D had knowledge that injury to Willard was substantially certain to occur when he was exposed to the dust created during the grinding of insulation material off of the bricks, thus satisfying the second prong of the *Fyffe* test.

{¶ 49} Lastly, we conclude that the record demonstrates an issue of fact as to whether Willard was required to continue to perform his work despite the dangerous condition. In his deposition, Willard testified that he complained numerous times to Daffner regarding exposure to the dust created by the grinding operation. He made these complaints both before and after Daffner received the MSDS for the Unifrax insulation. The MSDS clearly noted the inhalation warnings and safe handling recommendations. Willard further testified

that he requested the use of safety equipment and other protective gear, but was refused by R & D management. Specifically, Willard testified that he asked Daffner for a respirator but was told that the device was too expensive. We acknowledge that R & D disputes this allegation. Thus, we find that a genuine issue of fact exists regarding whether R & D required Willard to perform a job without any protective equipment, knowing that injury was substantially certain to result.

{¶ 50} The Conleys' first and second assignments of error are sustained.

IV

{¶ 51} The Conleys' first and second assignments of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for proceedings consistent with this opinion.

. . . . . . . . . .

GRADY, P.J. and RINGLAND, J., concur.

(Hon. Robert P. Ringland, Twelfth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Michael S. Miller
Warner M. Thomas, Jr.
Gordon D. Arnold
Patrick J. Janis
Hon. Christopher Gee